**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PATRICIA NILSEN; ANNA SANDI; AVERY SNYDER; CARRIE FORD; CHRISTEN RHODES; DIANE JANSEN; ERIN BOLAS; GLENA FELKER; GLORIA TORRES; JESSICA LOPEZ; JOVY LEGASPI; KATHLEEN POKORNY; KATHERINE GALANGA; KRISTI HUGHES; LYNNETTE MATHIAS; MAILE SIVAKANTHAN; MELISSA EARL-PATOPEA; MICHELLE SIZER; PETRA BIGEA; SHANNON SLISH; SUSAN GROLLER; CRYSTAL GIBSON, | No. 24-7460 <br> D.C. No. 2:23-cv-01498-MJP <br><br> OPINION |
| *Plaintiffs - Appellants*, | |
| v. | |
| UNIVERSITY OF WASHINGTON, a governmental agency; JENNIFER PETRITZ; KRISTI ARAVENA; KATHY SCHELL, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted May 20, 2026
Seattle, Washington

Filed August 13, 2026

Before: Richard C. Tallman, Richard R. Clifton, and Ryan
D. Nelson, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY[*]

### Eleventh Amendment Immunity

The panel affirmed the district court's summary
judgment in favor of the University of Washington (UW) in
a civil rights action brought by former employees after they
were fired for failure to comply with UW's COVID-19
vaccine mandate issued by the Governor of Washington
during the pandemic.

Appellants brought claims under 42 U.S.C. § 1983
alleging that UW violated their First and Fourteenth
Amendments rights. The district court dismissed these
claims, concluding that UW was an arm of the state under

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

the three-factor test articulated in *Kohn v. State Bar of California*, 87 F.4th 1021 (9th Cir. 2023) (en banc), and thus was not a "person" under § 1983.

While the appeal was pending, the Supreme Court decided *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), which addressed the "arm of the state" analysis. The panel held that the three-factor test articulated in *Kohn* survives *Galette*, but that *Galette* clarifies how much weight the court should give each factor.

Following *Galette*, to determine whether an entity is an arm of the state, the court considers the following three factors: (1) whether the State intended to create a legally independent entity, which is shown by the entity's form and treatment under state law; (2) whether the State is formally liable for the entity's debts or liabilities, including judgments; and (3) the degree of control the State exercises over the entity. The first factor bears the most weight, and the third bears the least.

Applying the refined test, the panel held that UW is an arm of Washington State and thus is not a "person" under § 1983. Accordingly, it cannot be sued for civil rights violations.

The panel addressed Appellants' other claims in a concurrently filed memorandum disposition.

## COUNSEL

Nathan J. Arnold (argued), Arnold Jacobowitz & Alvarado PLLC, Seattle, Washington; Dennis McGlothin, Western Washington Law Group PLLC, Bellevue, Washington; for Plaintiffs-Appellants.

Zachary J. Pekelis (argued), Pacifica Law Group LLP, Seattle, Washington; Timothy J. O'Connell, Brent Hamilton, and Aaron R. Doyer, Stoel Rives LLP, Seattle, Washington; for Defendants-Appellees.

## OPINION

TALLMAN, Circuit Judge:

States generally cannot be sued for civil rights violations under 42 U.S.C. § 1983 because they are not "persons" within the meaning of the law. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). A trickier question is whether an entity, such as a public university, may seek the same shelter as an arm of the state. *See id.* at 70 (immunity applies "to States or governmental entities that are considered 'arms of the State'"). Appellants are former employees of a public university, the University of Washington (UW). Relevant here,[1] they sued UW under § 1983 after they were fired for failure to comply with UW's COVID-19 vaccine mandate issued by the Governor of Washington during the pandemic. The district court dismissed these claims, concluding that UW was an arm of

---

[1] We address Appellants' other claims, including those against the individual defendants, in a concurrently filed memorandum disposition.

the state under the three-factor test we articulated in *Kohn v. State Bar of California*, 87 F.4th 1021 (9th Cir. 2023) (en banc), and thus was not a "person" under § 1983.

While this appeal was pending before us, the Supreme Court decided *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), which addressed the "arm of the state" analysis. Today we decide whether the *Kohn* test survives *Galette*. We conclude that it does, although *Galette* clarifies how much weight we should give each factor. Under this reweighted three-factor test, which emphasizes who pays any judgment that might ultimately be rendered against the university, we hold that UW is an arm of the state and affirm the district court's grant of summary judgment dismissing the § 1983 claims against it under the Eleventh Amendment doctrine of sovereign immunity.

# I

On August 20, 2021, then-Governor of Washington Jay Inslee issued Proclamation 21-14.1, which required all healthcare providers, employees in educational settings, and state employees to be vaccinated against COVID-19 by October 18, 2021, unless they received a medical or religious exemption. The Proclamation recited that exempt employees were entitled to reasonable accommodations under federal and state law, unless accommodating the unvaccinated employee would impose an undue hardship on the employer.

As a public university operating healthcare facilities through the University of Washington Medical Facility, Harborview Medical Center, Seattle Children's Hospital, and various medical clinics in Washington, UW was subject to the Proclamation and adopted its own vaccination policy implementing the Governor's directive. Appellants

requested and received religious and medical exemptions from vaccination. But UW determined that accommodating them in their respective positions would impose undue hardship and so denied many of the requested accommodations. None of the Appellants received the vaccine or could be accommodated through work reassignment or teleworking, so they were terminated.

Appellants sued UW and two of its human resources officers, alleging that their terminations violated federal and state law. They brought claims under § 1983 alleging that UW violated their rights under the First and Fourteenth Amendments to the United States Constitution.**[2]** The parties cross-moved for summary judgment on these claims. After concluding that UW was an arm of the state, the district court granted summary judgment to UW on these claims and dismissed them. This timely appeal followed.

## II

We review the district court's grant of summary judgment de novo. *Edwards v. Wells Fargo & Co.*, 606 F.3d 555, 557 (9th Cir. 2010). Whether an entity is an arm of the state is a question of federal law, *Kohn*, 87 F.4th at 1025, which we review de novo, *Walden v. Nevada*, 945 F.3d 1088, 1092 (9th Cir. 2019).

---

[2] These claims were brought as Appellants' third, fourth, ninth, thirteenth, and fourteenth causes of action. During summary judgment briefing, Appellants voluntarily dismissed their thirteenth cause of action. This opinion and the concurrently filed memorandum disposition dispose of all remaining claims in the litigation.

## III

## A

Section 1983 creates a cause of action against any "person" acting under color of law who deprives another of their constitutional rights.  But neither States nor governmental entities that are "arms of the state" are "person[s]" under § 1983 and thus cannot be sued under that statute.[3]  *Will*, 491 U.S. at 70–71.  The parties here dispute UW's status: is it an arm of Washington State or a legally independent entity?  To answer this question, we must first determine what test to apply.

Whether an entity is an arm of the state boils down to one essential question: "whether the state structured the entity to enjoy immunity from suit."  *Kohn*, 87 F.4th at 1030 (citation modified).  Three years ago, our en banc court directed us to consider three factors to answer that question: "(1) the state's intent as to the status of the entity, including the functions performed by the entity; (2) the state's control over the entity; and (3) the entity's overall effects on the state treasury."  *Id.* (citation modified).  Under this test, the factors appeared to carry equal weight; that is, no one factor was dispositive.  *See id.* at 1037 (noting that the third factor cannot overcome the other two).

The district court made its arm of the state determination under the test we articulated in *Kohn*.  But after appellate briefing concluded, the Supreme Court issued its opinion in

---

[3] There is an exception to this general rule which allows for suit against a state official in his or her official capacity for prospective injunctive relief.  *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (citing *Will*, 491 U.S. at 71 n.10).  The equitable claims against UW do not implicate this exception because they are brought against the institution itself.

*Galette*.  *Galette* was one of two consolidated cases, both of which presented the same question: was the New Jersey Transit Corporation entitled to sovereign immunity as an arm of the state?  607 U.S. at 515.  In one case, the New York Court of Appeals concluded that it was not; in the other, the Pennsylvania Supreme Court said that it was.  *Id.* at 517–19.  The Supreme Court granted certiorari in both cases to resolve the conflict.  *Id.* at 519.

The Court concluded that the Transit Corporation was not an arm of the state.  *Id.* at 528.  It reaffirmed that the essential question guiding the inquiry is "whether the State structured the entity as part of itself or as legally independent," *id.* at 525, which "can be answered only after considering the provisions of state law that define the [entity's] character."  *Id.* at 519 (citation omitted).

The Court explained the "clearest evidence" that a State structured a legally independent entity was that the entity was established as "a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt."  *Id.* at 524.  The corporate form has traditionally involved "separate legal personality," which means "courts should presume . . . that [a] corporate entity is no longer part of the State itself."  *Id.* at 524–25 (citation modified).

The corporate form, however, is not the only way for a State to create a legally independent entity.  *Id.* at 525.  As the Court acknowledged, "[o]ther aspects of state law may indicate legal separateness," such as by defining the entity "as not part of the State for other purposes" or by describing it as a "separate legal entity."  *Id.*

The Court also looked to "whether the entity is liable for its own judgments or whether the State is formally liable

[because] any judgment against the entity must be satisfied out of the state treasury." *Id.* (citation modified). Formal legal liability was the relevant factor, not the entity's "practical financial relationship with the State, such as its expectation that the State would cover its judgments if needed." *Id.* The Court recognized that a State may indemnify or subsidize entities like nonprofits, private corporations, or municipalities, but that practical financial relationship did not convert those entities into arms of the state. *Id.* at 525–26.

Finally, the Court acknowledged that "courts may consider the degree of control the State exerts over the entity," but "should do so with caution" because "ultimate control of every state-created entity resides with the State, even those that are not arms of the State." *Id.* at 526 (citation modified).

In short, *Galette* identified three factors, listed here in descending order of importance: (1) how the entity is structured in relation to the State under state law; (2) whether the State is formally liable for judgments against the entity; and (3) the degree of control the State exercises over the entity. We now consider whether *Kohn*'s three-factor test is "clearly irreconcilable" with *Galette*. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). As discussed below, we conclude that *Galette* refines *Kohn* rather than displaces it.

While using some different language, the Supreme Court considered substantially the same three factors as *Kohn* did. The first factor, which *Kohn* called "the state's intent as to the status of the entity," 87 F.4th at 1030 (citation modified), was styled in *Galette* as "whether the State had structured the entity to be legally separate." 607 U.S. at 521. But

*Galette*, like *Kohn*, noted that similar considerations under state law were relevant: how state law characterized the entity and whether the entity was defined as part of the State for other purposes under state law for example.  *Compare id.* at 525, *with Kohn*, 87 F.4th at 1030.   Thus, despite the different labeling, we conclude that the first *Kohn* factor and first *Galette* factor inform the same consideration: did the State intend to create an entity that was part of itself or legally independent?

To be sure, *Galette*'s analysis under this factor differs from ours in two respects.  First, *Galette* emphasized the importance of the corporate form as "[t]he clearest evidence that a State has created a legally separate entity."  607 U.S. at 524.  This does not mean that only corporations are legally separate entities, *see id.* at 525, but that corporate form is a weighty consideration under this factor.  Second, *Galette* dismissed as irrelevant whether the entity exercised traditional governmental or public powers.  The relevant consideration was not "whether the entity serves public functions, but rather . . . whether the State has chosen to serve those public functions through its own apparatus or through that of a legally separate entity."  *Id.* at 532.  To the extent *Kohn* differs from *Galette* in its emphasis on these considerations under the first factor, *Galette* clarifies what is relevant to our assessment.

The second *Kohn* factor considers "the state's control over the entity."   87 F.4th at 1030 (citation modified). *Galette* found this factor "not especially probative" because the State retains ultimate control over every entity it creates, "even those that are not arms of the State."  607 U.S. at 526. The Supreme Court also noted that "gauging actual control" was "an uncertain and unreliable exercise" that made this factor difficult to apply.  *Id.* (citation modified).  The Court

allowed, however, courts to consider control as a factor, albeit with caution.  *Id.*  Thus, the second *Kohn* factor remains in play, although *Galette* teaches that it carries the least weight.

The third *Kohn* factor considers "the entity's overall effects on the state treasury."  87 F.4th at 1030 (citation omitted).  *Galette* narrows the scope of this factor by focusing only on who ultimately pays—whether the State is "formally liable for judgments" against the entity, or the entity's other debts or liabilities.  607 U.S. at 525, 529–30. The Court found the entity's "practical financial relationship with the State, such as its expectation that the State would cover its judgments if needed" or its receipt of state funding, less relevant than the State's "formal legal liability."  *Id.* at 525–26.  As with the first factor, *Galette* simply clarifies what is relevant to our assessment; it does not eliminate the factor from consideration.

One other point bears mentioning.  Under *Kohn*, the factors appeared to bear equal weight.  *See* 87 F.4th at 1037. *Galette*, however, makes clear that they do not, as the State's degree of control over the entity should be considered only "with caution."  607 U.S. at 526–27.

Accordingly, we conclude that while *Galette* did not effectively overrule the *Kohn* test, it did refine and rebalance the test.  To determine whether an entity is an arm of the state, we consider the following three factors: (1) whether the State intended to create a legally independent entity, which is shown by the entity's form and treatment under state law; (2) whether the State is formally liable for the entity's debts or liabilities, including judgments; and (3) the degree of control the State exercises over the entity.  The first

factor bears the most weight, and the third bears the least. *See id.* at 523–27.

**B**

Applying this refined test, we hold that UW is an arm of Washington State and thus is not a "person" under § 1983. It cannot be sued for civil rights violations.

**1**

We first consider whether UW's form and treatment under Washington law shows an intent to create a legally independent entity.

"The clearest evidence" that Washington intended UW to be "a legally separate entity" would be if it had created UW as a corporation. *Id.* at 524. It appears, however, that UW is not a corporation under state law. *See* Wash. Rev. Code § 28B.20.010 (designating the institution simply as "the University of Washington" without language indicating corporate form).

Appellants argue that UW is not an arm of the state because it was created as a corporation years before Washington was admitted to the Union. Because it was created in corporate form and predates Washington's statehood, Appellants contend (1) that its corporate character remains, and (2) for "arm of the state" purposes, we should consider the Washington Legislature's intent to create a legally separate entity at the time the entity was created. Before addressing Appellants' contentions, we briefly consider the circumstances of UW's creation.

In 1863, the Territorial Legislature of Washington created a board of regents "under the name of the University of the Territory of Washington" to "provide the inhabitants

of [the] territory with the means of acquiring a thorough knowledge of the various branches of the literature, science and arts." Act of Jan. 23, 1863, §§ 1–2, 1862–63 Wash. Territorial Stat. 477, 477. The Territorial University was created as "a body corporate and politic, with perpetual succession," that could "sue and be sued, plead and be impleaded, in all courts of law and equity." *Id.* § 1. It had the power to hold all real or personal property necessary to accomplish its purpose; to "enact ordinances, by-laws, and regulations" for its government; to elect, appoint, and remove the president, the faculty, and other officers; and to manage and control the course of studies and confer degrees. *Id.* §§ 5–11. The regents were elected by the Territorial Legislature. *Id.* § 4.

Washington Territory was admitted to the Union as Washington State on November 11, 1889. Don Brazier, *History of the Washington Legislature 1854 – 1963* 41 (2000). Shortly thereafter, the first State Legislature "established in this state, at or near the city of Seattle, . . . an institution of learning under the name and style of the University of Washington." Act of Mar. 27, 1890, § 1, 1889–90 Wash. Sess. Laws 395, 395. The 1890 Act did not use the "body corporate and politic" language as had been used to describe the University of the Territory of Washington. *See id.* at 395–99. Instead, it gave UW, acting through its board of regents, the power to enact laws for the university's government; appoint officers and faculty; manage and control the course of studies and award degrees; spend the university fund's income to obtain "apparatus" and "other means of facility for instruction"; and prescribe admission standards and tuition rates. *Id.* §§ 6–8, 10, 12.

UW's regents would be appointed by the governor, with the senate's advice and consent. *Id.* § 4. They were required

to submit annual reports "of all their doings," including financial transactions and future budget estimates, to the governor. *Id.* § 11. UW did not have the power to sell its lands; only the Legislature could do so, and proceeds were paid into the state treasury as the "state university fund." *Id.* § 16. UW was only allowed to use the fund's income. *Id.* The principal could be invested only by the State. *Id.* § 17. Washington's Attorney General was designated as UW's legal advisor and directed to "institute and prosecute or defend all suits" on its behalf. *Id.* § 19. Finally, UW was prohibited from creating any debt or liability beyond its annual income. *Id.* § 20.

Over time, Washington has granted UW's regents additional powers. *See, e.g.*, School Code, tit. II, ch. 97, § 5, 1909 Wash. Sess. Laws 230, 240–41 (among other things, granting the board of regents "full control of the university and its property of various kinds"). Today, the Revised Code of Washington primarily addresses UW in chapters 28B.10 (Colleges and Universities Generally) and 28B.20 (University of Washington).

Considering this history, we see no indication that the pre-statehood corporate entity known as the University of the Territory of Washington is the same entity in law as today's University of Washington. The 1890 Act used language of creation when referring to the state university: "[t]here *shall be established* . . . an institution of learning under the name and style of the University of Washington." Act of 1890 § 1, 1889–90 Wash. Sess. Laws at 395 (emphasis added). In contrast, the 1909 School Code used language of continuation to refer to the state university: "[t]he State University, *as heretofore located and established* . . . , shall be designated and named the University of Washington." School Code, tit. II, ch. 97, § 1,

1909 Wash. Sess. Laws at 238 (emphasis added). This suggests that the 1890 Act created a new legal entity after statehood, rather than continuing a preexisting entity as the 1909 School Code did.

This conclusion is bolstered by the 1890 Act's treatment of the board of regents. After vesting UW's governance in the board of regents and describing their manner of appointment and term length, the Act provided "[t]hat those appointed on the first board under this act" would hold their offices for staggered terms: "two for five years, two for three years, and three for one year." Act of 1890 § 3, 1889–90 Wash. Sess. Laws at 396. This suggests that an entirely new board was being appointed, and staggered terms instituted so that the new regents' terms would not all expire at once. This is again reinforced by comparison to the 1909 School Code, which provided instead "[t]hat regents now serving upon [the] board shall continue as such during the terms for which they were respectively appointed." School Code, tit. II, ch. 97, § 3, 1909 Wash. Sess. Laws at 239.

In sum, the 1890 Act created a new board of regents for a new public institution, unlike the 1909 School Code, which amended the organic law of a preexisting institution. This indicates that modern day UW is a legally different entity than the old University of the Territory of Washington.[4] And unlike the Territorial University, UW was not created in the corporate form. *See generally* Act of 1890, 1889–90 Wash. Sess. Laws at 395–99. Nor was it given the full slate of corporate powers. Notably absent from the 1890 Act is a grant of the right to sue and be sued. *See id.* UW also could not now dispose of its own land without legislative approval

---

[4] Even if UW was the same legal entity, the Legislature intended to limit UW's powers to less than what was granted to the Territorial University.

or enter into contracts, acquire property, or incur debt except as specified in the Act. *Id.* §§ 7–8, 16, 20; *see Galette*, 607 U.S. at 524 (noting the traditional corporate powers).

Today, UW still is not described as a corporation under state law and lacks the express power to sue and be sued. *See* Wash. Rev. Code §§ 28B.20.010, 28B.20.130. But it has been granted other traditional corporate powers: it may accept and dispose of property, over which it has "full control . . . except as otherwise provided by law"; it may enter into contracts for university purposes; and it may incur debt, including by issuing bonds. *See, e.g.*, *id.* §§ 28B.20.130, 28B.20.700–.715. Those powers, however, are not absolute. *See, e.g.*, *id.* §§ 28B.10.020 (certain property acquisitions subject to approval by a politically appointed council); 28B.20.145 (UW cannot create debt beyond its biennial income levels); 28B.20.382 (UW cannot sell certain lands without legislative act).

State law also treats UW as—indeed, expressly classifies it as—a state agency, subject to the obligations imposed on state agencies. *See, e.g.*, *id.* § 34.05.010(2) (defining any "institution of higher education" as an "agency" subject to the Administrative Procedure Act); § 42.30.020(1)(a) (defining any "educational institution . . . created by or pursuant to statute" as a "public agency" subject to the Open Public Meetings Act); § 42.56.010(1) (subjecting "state agencies" to the Public Records Act). UW also has the power to exercise eminent domain in accordance with chapter 8.04 of the Revised Code of Washington, which governs eminent domain powers exercised by the State. *Id.* § 28B.10.020. In contrast, chapter 8.20 of the Code governs eminent domain exercised by corporations; this distinction further indicates that Washington considers UW part of itself, rather than an independent corporation. While

Washington's classification of UW as a state agency does not, standing alone, make UW an arm of the state, the obligations and limitations that Washington law imposes on UW because of that classification suggests to us that Washington considers UW as part of itself.

Finally, any lawsuits brought against UW in state court must be filed in accordance with chapter 4.92 of the Code, which sets forth procedures for "claims against the state or against the state's officers, employees, or volunteers, acting in such capacity, for damages arising out of tortious conduct." *Id.* § 4.92.100; *Kleyer v. Harborview Med. Ctr. of Univ. of Wash.*, 887 P.2d 468, 472 (Wash. Ct. App. 1995). The Washington Supreme Court has also treated UW as an arm of the state in a civil rights action under § 1983.[5] *Hontz v. State*, 714 P.2d 1176, 1180 (Wash. 1986); *cf. Kohn*, 87 F.4th at 1032 (recognizing that "state court treatment is also relevant" to discern the State's intent with respect to the entity's status).

In sum, applying the *Kohn* test in light of *Galette*, we conclude that Washington intended UW to be an arm of the state, not a legally separate entity. While UW has considerable power to act, it is subject to the constraints all State offices and departments must abide by. Washington also extends sovereign immunity to UW in its own courts as an arm of the state. Finally, history shows that Washington made a choice after achieving statehood: UW was not

---

[5] Long before *Kohn* or *Galette*, we accepted the premise that UW was an arm of the state. *See Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984). *Goodisman* appeared to assume both that UW was an arm of the state and that the damages sought would be paid out of the state treasury. *See id.* As we also hold that UW is an arm of the state in light of the Supreme Court's most recent articulation of the test we are to employ, we see no need to revisit *Goodisman*.

granted the corporate independence afforded its territorial predecessor. Thus, we conclude that the analysis of this factor favors the district court's decision that UW is an arm of the state.

**2**

Next we consider whether Washington is formally liable for UW's debts or liabilities, including judgments against it. UW contends that Washington is liable for judgments against it because those judgments are paid out of a general liability account for the State's operations. We are not so sure.

The Revised Code of Washington allows the board of regents of an institution of higher education to ask the Attorney General to defend a claim against the institution or its agents. Wash. Rev. Code § 28B.10.842. The costs of defense, including the cost of a judgment, are paid from a liability account drawn on the state treasury. *Id.*; § 4.92.130. But unlike other institutions of higher education, Washington has created a "self-insurance revolving fund" for the sole purpose of paying defense costs, judgments, and claims against UW, which UW holds and funds. *Id.* § 28B.20.253. This fund appears to be the "exclusive" means for paying defense costs and judgments for all claims against UW. *See id.* § 28B.20.255 (noting that the statutory provisions concerning this fund govern "notwithstanding" § 28B.10.842 and ch. 4.92); *Kleyer*, 887 P.2d at 472–73 (concluding that the self-insurance provisions supersede ch. 4.92 to the extent they are inconsistent). Thus, it appears that UW's judgments are not paid from the State's general liability fund.

That does not end our analysis, however, because the self-insurance revolving fund may still be state money.

When the Legislature created UW's self-insurance revolving fund, the fund was held "in the custody of the treasurer." Act of Feb. 17, 1976, ch. 12, § 2, 1975–76 Wash. Sess. Laws 21, 22 (2d Extraordinary Session). The fund was later transferred to UW's custody. Act of May 7, 1997, ch. 288, § 1, 1997 Wash. Sess. Laws 1651, 1651 (codified at Wash. Rev. Code § 28B.20.253(1)). This was done for administrative simplicity but appears not to have changed the money's public character. *See id.* at 1652 (note). This conclusion is reinforced by the fact that UW does not have total discretion over the fund; payment of claims above a certain threshold must be approved by the Attorney General, indicating that these remain state monies held locally by a state agency rather than in the treasury. Wash. Rev. Code §§ 28B.20.253(1)(b) (approval authority); 43.79.019 (recognizing the existence of "funds or accounts held locally by any state agency" that may be transferred to the state treasury if "financially advantageous"). The record does not show what other sources of revenue may be realized from the leasing of UW's valuable property in the core of downtown Seattle, from research grants from the Federal government or other third parties who may contract with the University for applied research projects, or tuition paid by its students or funded by other sources.

Washington also appears not to have disclaimed all formal liability for UW's debts and other liabilities. Washington has disclaimed formal liability for certain bonds issued by UW. *See, e.g.*, *id.* §§ 28B.10.330; 28B.20.396; 28B.20.715(1)(a). But the fact that Washington has disclaimed liability for certain obligations, rather than disclaiming all obligations, suggests that it retains formal liability for all debts or liabilities not disclaimed. *Compare* N.J. Rev. Stat. § 27:25-17 ("No debt or liability of the [New

Jersey Transit Corporation] shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State."); *see Galette*, 607 U.S. at 529–30 (relying on this disclaimer to conclude that the State is not formally liable for the Transit Corporation).

In sum, this factor is neutral. It appears Washington may be formally liable for some but not all of UW's debts and liabilities. And our conclusion regarding the self-insurance revolving fund's status as state monies remains tentative, as no record evidence supports or refutes our assessment. Accordingly, this factor does not tilt the balance either way.

**3**

Finally, we consider the degree of control Washington exercises over UW. In doing so, we are mindful of the Supreme Court's admonition that we should do so "with caution." *Galette*, 607 U.S. at 526. Both parties agree that the governor appoints UW's regents with the senate's consent. Wash. Rev. Code § 28B.20.100(1)(b). The governor has limited power to remove the regents, which can be done only upon misconduct or malfeasance in office, proved before a three-judge tribunal. *Id.* § 28B.10.500. As noted above, while the board of regents has "full control of the university and its property of various kinds," *id.* § 28B.20.130(1), several of its major actions are subject to approval by the Legislature or executive agents. And unlike in *Galette*, there is no provision of law expressly declaring UW to be "independent of any supervision or control by" any state department or officer or requiring it to "exercise independent judgment." 607 U.S. at 530. Indeed, there are several provisions of law expressly requiring oversight and approval by other state actors. *See, e.g.*, Wash. Rev. Code

§ 28B.20.382 (prohibiting the sale of certain lands without legislative approval).

But we do not engage further in this "uncertain and unreliable exercise." *Galette*, 607 U.S. at 526 (citation omitted). As the Supreme Court noted, it is difficult to gauge the degree of control exercised by the State. *Id.* This is particularly true when, as here, two entire chapters of state law directly regulate the entity. Wash. Rev. Code chs. 28B.10, 28B.20. Many other provisions throughout Title 28B and the rest of the Revised Code of Washington also govern UW and its activities. Thus, while it is possible to point to the "full control" granted by section 28B.20.130(1) as supporting independence, that control is expressly limited "as . . . provided by law." And as our survey of Title 28B alone indicates, there is much law on the subject. Thus, we conclude that while this factor is not particularly probative, it does weigh slightly in favor of finding UW an arm of the state.

\* \* \*

In sum, after surveying Washington law and the university's history, we conclude that UW is an arm of the state. Our survey indicates that Washington State did not intend to create a separate legal entity. When Washington first created UW after joining the Union, it deliberately chose not to create a corporate entity as it had with UW's territorial predecessor. And while it has granted UW additional powers over the years, Washington has continued to treat UW as a state agency for all purposes, from public recordkeeping obligations to sovereign immunity in its own courts. Furthermore, while it has disclaimed formal liability for some of UW's debts and liabilities, Washington has stopped short of totally renouncing its responsibility for all

of UW's obligations.  Accordingly, we conclude that the answer to *Galette*'s "ultimate question" is that Washington State structured UW as part of itself, not as a legally independent entity.  607 U.S. at 525.

## IV

We hold that the Supreme Court's most recent decision in *Galette* refines and rebalances the three-factor test we articulated in *Kohn*.  Applying the rebalanced test, we again hold that UW is an arm of the state and thus is not a "person" under § 1983.  Accordingly, the district court did not err in granting summary judgment to UW dismissing the § 1983 claims brought against it.

**AFFIRMED.**